## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MOSES J. BOND, ET AL.,               :
                                     :
   Plaintiffs,                       :
                                     :
  v.                                 :      No. 3:98CV1602(DJS)
                                     :
CITY OF MIDDLETOWN,                  :
                                     :
   Defendant.                        :

### MEMORANDUM OF DECISION

On August 10, 1998, eight plaintiffs commenced this action, alleging that defendant City of Middletown ("the City") and several of the City's employees had violated provisions of the U.S. Constitution as well as certain federal and state laws.  The plaintiffs, after filing two previous versions of their complaint, advanced the following thirteen claims in their Second Amended Complaint: (1) racial discrimination, in violation of 42 U.S.C. § 1981; (2) racial and age discrimination and retaliation, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.; (3) violations of the plaintiffs' First Amendment rights, pursuant to 42 U.S.C. § 1983; (4) violations of the plaintiffs' Equal Protection rights under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983; (5) violations of the plaintiffs' substantive due process rights under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983; (6) violations of the plaintiffs' procedural due process rights under the Fourteenth

Amendment, pursuant to 42 U.S.C. § 1983; (7) conspiracy to interfere with the plaintiffs' civil rights, in violation of 42 U.S.C. § 1985; (8) neglect to prevent a conspiracy to interfere with the plaintiffs' civil rights, in violation of 42 U.S.C. § 1986; (9) lack of fair dealing in good faith with the plaintiffs by breaching a collective bargaining agreement; (10) breaching the duty of fair dealing pursuant to a collective bargaining agreement, in violation of Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a); (11) negligent infliction of emotional distress; (12) intentional infliction of emotional distress; and (13) age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.  After various motions, severance of certain claims, and a jury trial, the only remaining plaintiff is Battista Dino Cendali ("Cendali"), and the only remaining defendant is the City.  Now pending is the City's motion for summary judgment (dkt. # 163) pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons stated herein, the City's motion (dkt. # 163) is **GRANTED.**

## I. FACTS

Cendali is a former employee of the City, which is a municipal corporation in the State of Connecticut.  The City hired Cendali on August 14, 1989, and at all relevant times, Cendali worked as a Utility Worker for the City's Department of

Water and Sewer ("DWS").  As a Utility Worker for the City,
Cendali was a member of Local 466 of the American Federation of
State, County, and Municipal Employees ("AFSCME"), AFL-CIO,
which, pursuant to the Collective Bargaining Agreement ("CBA")
between the City and Local 466, represents all the laborer-grade
and utility-grade workers in the DWS.

Cendali, who is Caucasian, claims that during the course of
his employment, he observed what he determined to be
discriminatory and differential treatment of African-American and
Hispanic-American DWS employees.  In particular, Cendali asserts
that Guy Russo ("Russo"), who became the Director of the DWS in
December of 1995, discriminated against minority workers.  Thus,
on December 6, 1995, Cendali, along with three other City
employees, wrote a letter to then-mayor Maria Madsen Holzberg
("Holzberg"), requesting a meeting for the purpose of relating
their grievances to Holzberg.  Holzberg, however, declined to
meet with the signatories of this letter.  On December 12, 1996,
Cendali provided an affidavit in support of a complaint that
Curtis Cockfield ("Cockfield"), an African-American co-worker of
Cendali, had filed with the Commission on Human Rights and
Opportunities ("CHRO") against Russo and other City officials.
In his affidavit, Cendali stated that he had observed what he
perceived to be discriminatory conduct in the DWS.

Cendali contends that, in retaliation for filing his

affidavit in Cockfield's CHRO proceeding, he experienced discriminatory and harassing treatment from DWS employees. Particularly, Cendali asserts that he has received a number of unjustified and factually inaccurate negative criticisms of his work performance.  In one instance, Cendali claims that his supervisors disciplined him for using the telephone to consult on his wife's health.  In another instance, Cendali was suspended for allegedly uttering threatening words to a co-worker, even though, Cendali claims, his supervisors had not yet investigated the incident, and he and the co-worker had reconciled. In addition, Cendali claims that his supervisors have required him, on a number of occasions, to work outdoors in "extremely inclement weather."  Also, Cendali claims that his supervisors had consistently denied him the opportunity to work overtime. Cendali specifically points to one instance in December of 1997, where he was denied the opportunity for overtime snow clearance work.  Additionally, Cendali claims that he has experienced discriminatory treatment because of his age.  Cendali notes that on April 6, 1998, he was injured on the job, hurting his left leg.  Cendali's supervisor, Donald Fisco ("Fisco"), apparently related in the accident report Cendali's statement that Cendali was "getting old," but Cendali claims that he never commented about his age to Fisco.  Moreover, Cendali also maintains that Fisco, in the accident report, speculated that Cendali had

-4-

probably "over exerted himself."  Cendali asserts that he tried
to meet with and discuss his complaints with Holzberg, but that
she refused to meet with him.

Cendali filed a joint Charge of Discrimination, which the
CHRO received on May 8, 1998, and the Equal Employment
Opportunity Commission ("EEOC") received on June 26, 1998.
Cendali received a release of jurisdiction and right-to-sue
letter on September 22, 1998.  On August 10, 1998, however,
before he received his right-to-sue letter, Cendali, along with
City employees Cockfield, Moses Bond ("Bond"), Tanya Oliver-Perry
("Oliver-Perry"), Joel Brown ("Brown"), Richard Dimmock
("Dimmock"), Gary Corriveau ("Corriveau"), and Ralph Scharborough
("Scarborough") filed this action ("the 1998 action")against the
City and nine of the City's employees in their official
capacities.  At the court's direction, the plaintiffs filed an
Amended Complaint, dated November 10, 1998.  In response to the
Amended Complaint, the defendants filed eight separate motions to
dismiss, separately addressing the claims raised by each
plaintiff.  After these motions were filed, the claims of
plaintiffs Corriveau and Scharborough were dismissed by
stipulation.

On August 23, 1999, the plaintiffs filed the Second Amended
Complaint, in which the plaintiffs advanced thirteen separate
causes of action.  On December 29, 1999, the defendants moved for

summary judgment as to all the claims in the Second Amended
Complaint, and the plaintiffs filed an opposition thereto on
February 3, 2000.  On September 29, 2000, the court ruled on the
summary judgment motion, granting it for the individual
defendants and denying it, without prejudice, for the City.  The
result of the court's ruling was that only the City remained as a
defendant.

Cendali's claims in the 1998 action were, pursuant to a
motion by the City, severed from the claims of the remaining
plaintiffs because Cendali commenced a second lawsuit ("the 2001
action") against the City and Fisco.[1]  In the 2001 action,
Cendali filed a three-count Amended Complaint, alleging: (1)
retaliation for filing his affidavit with Cockfield's CHRO
complaint, and for filing the 1998 action, in violation of 42
U.S.C. § 1981; (2) age discrimination, in violation of the ADEA;
and (3) retaliation for engaging in speech protected by the First
Amendment, in violation of 42 U.S.C. § 1983.  Cendali, in the
2001 action, claimed that the defendants' discriminatory and
retaliatory conduct ultimately led to his termination on May 31,
2000.  The defendants filed a motion for summary judgment, dated
December 9, 2002, and on July 31, 2003, the court granted the
motion on all counts of Cendali's Amended Complaint.  Cendali did

---

[1] Cendali v. City of Middletown, No. 3:01CV1148 (DJS) (D.
Conn.).

not appeal the court's judgment in the 2001 action.

Beginning on October 15, 2002, the claims brought by Bond, Brown, Dimmock, and Cockfield in the 1998 action were tried to a jury.  On October 25, 2002, the jury rendered its verdict in favor of the City as to all the plaintiffs' claims, and on November 4, 2002, judgment entered in favor of the Cityagainst these four plaintiffs.  By a stipulation filed on April 11, 2003, Oliver-Perry's claims were dismissed.  Judgment has been entered against Cendali in his 2001 action, judgment has entered in favor of the City against Bond, Brown, Cockfield, and Dimmock, and all that remains pending with respect to this dispute are Cendali's claims in the 1998 action.  On August 29, 2003, the court conducted a telephonic status conference with the parties to discuss how to proceed with Cendali's claims in the 1998 action. At the City's request, the court permitted the City to file a second motion for summary judgment as to Cendali's remaining claims, which it did on September 19, 2003.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

### B. COUNT ONE: SECTION 1981

In Count One, Cendali claims that the City violated 42 U.S.C. § 1981 by discriminating and retaliating against him because of his support for minority workers who were "in pursuit

of their legal rights."[2]   Section 1981(a) provides the
following:

> [a]ll persons within the jurisdiction of the United
> States shall have the same right in every State and
> Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens,
> and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981(a).

Cendali cannot prevail on his § 1981 claim.  In Jett v.
Dallas Independent School District, the Supreme Court held that
"the express 'action at law' provided by [42 U.S.C.] § 1983 for
the 'deprivation of any rights, privileges, or immunities secured
by the Constitution and laws,' provides the exclusive federal
damages remedy for the violation of the rights guaranteed by
§ 1981 when the claim is pressed against a state actor."  491
U.S. 701, 735 (1989).  Additionally, the Court in Jett held that
a plaintiff who sues a municipality under § 1983 for a violation

---

[2] Although Cendali is Caucasian, he still may have standing
to bring a claim under § 1981.  See Albert v. Carovano, 851 F.2d
561, 572-73 (2d Cir. 1988).  "[A] white person who has been
'. . . punished for trying to vindicate the rights of (non-white)
minorities . . .' has standing to sue under s 1981."  DeMatteis
v. Eastman Kodak Co., 511 F.2d 306, 312 (2d Cir. 1975) (quoting
Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237 (1969)),
modified on other grounds, 520 F.2d 409 (2d Cir. 1975).  The City
does not dispute that Cendali, even though he is a non-minority,
has standing to bring a § 1981 claim, because Cendali asserts
that the City retaliated against him for filing an affidavit with
Cockfield's CHRO complaint.

of his rights under § 1981 may not rely upon the doctrine of respondeat superior, and the "policy or custom" requirement for municipal liability under § 1983, as set forth in Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690-91 (1978), must be satisfied.  Jett, 491 U.S. at 735-36.

After the Supreme Court decided Jett, however, Congress, in 1991, added subsection (c) to § 1981, which states that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."  42 U.S.C. § 1981(c).  After the 1991 amendment, some courts found that § 1981(c) statutorily overruled, at least in part, the holdings in Jett.  See Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1214 (9th Cir. 1996) ("[W]e conclude that the amended 42 U.S.C. § 1981 contains an implied cause of action against state actors, thereby overturning Jett's holding that 42 U.S.C. § 1983 provides the exclusive federal remedy against state actors for the violation of rights under 42 U.S.C. § 1981.");  Robinson v. Town of Colonie, 878 F. Supp. 387, 405 n.13 (N.D.N.Y. 1995) ("[S]ubsection (c) [of 42 U.S.C. § 1981] . . . overrules, in pertinent part, the Supreme Court's decision in [Jett].").  Indeed, the enactment of subsection (c) has caused a circuit split as to whether Jett's holdings were overruled, casting doubts on Jett's viability.  Compare Fed'n of African Am. Contractors, 96 F.3d at 1214 (holding that § 1981, as amended in

1991, overturned <u>Jett</u>'s holding that 42 U.S.C. § 1983 provided
the exclusive federal remedy against state actors for violations
of rights under 42 U.S.C. § 1981), <u>with</u> <u>Oden v. Oktibbeha County,</u>
<u>Miss.</u>, 246 F.3d 458, 462-64 (5th Cir. 2001) (concluding that 1991
amendments to § 1981 did not overrule <u>Jett</u>).  The Second Circuit,
though, has not made any express finding on this issue.  <u>See</u>
<u>Anderson v. Conboy</u>, 156 F.3d 167, 178 n.19 (2d. Cir. 1998)
("Section 1981(c) may be ambiguous as to whether it creates an
implied private right of action against state actors under
Section 1981, statutorily overruling [<u>Jett</u>], which held that 42
U.S.C. § 1983 provides the exclusive federal remedy against
municipalities for violation of the rights set forth in Section
1981(a).").

This court, in the absence of controlling authority to the
contrary, will not deviate from the Supreme Court's analysis of
§ 1981 in <u>Jett</u>.  <u>See</u> <u>Felton v. Polles</u>, 315 F.3d 470, 480-81 (5th
Cir. 2002); <u>Oden</u>, 246 F.3d at 464; <u>Butts v. County of Volusia</u>,
222 F.3d 891, 894 (11th Cir. 2000) ("Nothing in the 1991
amendment to § 1981 evinces Congress' desire to alter the Supreme
Court's conclusion in <u>Jett</u>. . . . Accordingly, we conclude that
<u>Jett</u> still governs this case."); <u>Dennis v. County of Fairfax</u>, 55
F.3d 151, 156 n.1 (4th Cir. 1995) ("We think the correct reading
of the [1991] amendment [to § 1981] is . . . that subsection (c)
did not purport to overrule <u>Jett</u>'s holding with respect to

municipal liability."); <u>Williams v. Little Rock Mun. Water Works</u>,
21 F.3d 218, 224 (8th Cir. 1994); <u>Burbank v. Office of the Att'y
Gen. of Conn.</u>, 240 F. Supp. 2d 167, 174 (D. Conn. 2003); <u>Mack v.
Port Auth. of New York and New Jersey</u>, 225 F. Supp. 2d 376, 383
(S.D.N.Y. 2002) <u>Roddini v. City Univ. of New York</u>, No. 02 Civ.
4640, 2003 WL 435981, at *5 n.7 (S.D.N.Y. Feb. 21, 2003).  Under
<u>Jett</u>, any claim of a deprivation Constitutional rights,
privileges, or immunities by a state actor must be brought
pursuant to § 1983, not § 1981.  Cendali is asserting such a
deprivation by a state actor (i.e., the City), but he brought his
claim pursuant to § 1981, which, according to <u>Jett</u>, does not
create a private cause of action against state actors.
Consequently, because this court finds that <u>Jett</u>'s § 1981
analysis still controls, Cendali's § 1981 claim against the City
must fail.  The City's motion as to Count One is granted.

### C. COUNT TWO: TITLE VII

In Count Two, Cendali claims that the City violated Title
VII of the Civil Rights Act, 42 U.S.C. § 2000e <u>et</u> <u>seq.,</u> by
retaliating against him because of his support for minority
workers who were "in pursuit of their legal rights."[3]  Section

---

[3] The parties consistently refer to "racial or age
discrimination and/or retaliation in violation of Title VII, 42
U.S.C. § 2000e <u>et</u> <u>seq.</u>"  The court presumes that, with regard to
age discrimination, the parties intended to reference the ADEA.
Therefore, all age discrimination allegations will be discussed
in another part of this memorandum.

2000e-2(a) provides:

> It shall be an unlawful employment practice for an
> employer--
>
> (1) to fail or refuse to hire or to discharge any
> individual, or otherwise to discriminate against any
> individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of
> such individual's race, color, religion, sex, or
> national origin; or
>
> (2) to limit, segregate, or classify his employees or
> applicants for employment in any way which would
> deprive or tend to deprive any individual of employment
> opportunities or otherwise adversely affect his status
> as an employee, because of such individual's race,
> color, religion, sex, or national origin.

42 U.S.C. 2000e-2(a).

First, the City argues that this court lacks jurisdiction
over Cendali's Title VII claim because his right-to-sue letter
was issued too early.  The City relies on § 2000e-5(f)(1), which
provides, in relevant part:

> [i]f a charge filed with the Commission . . . is
> dismissed by the Commission, or if within one hundred
> and eighty days from the filing of such charge . . .
> whichever is later, the Commission has not filed a
> civil action under this section . . . or the Commission
> has not entered into a conciliation agreement to which
> the person aggrieved is a party, the Commission . . .
> shall so notify the person aggrieved and within ninety
> days after the giving of such notice a civil action may
> be brought against the respondent named in the charge.

42 U.S.C. 2000e-5(f)(1).  Cendali filed his joint charge with the
CHRO on May 8, 1998, and then with the EEOC on June 26, 1998.
The EEOC issued Cendali's right-to-sue letter on September 22,

-13-

1998, which was less than 180 days from the filings with both the CHRO and the EEOC.  The City asserts that, under § 2000e-5(f)(1), any right-to-sue letter issued before the statutory 180-day period runs cannot serve as a basis for suit in this court.

There is no binding authority on this issue; the circuits are split as to whether a federal court may entertain a Title VII suit based upon an "early" right-to-sue letter.  Compare Martini v. Fed. Nat'l Mortgage Ass'n, 178 F.3d 1336, 1347 (D.C. Cir. 1999) (holding that suits in the district court based on early right-to-sue letters are premature), with Sims v. Trus Joist MacMillian, 22 F.3d 1059 (11th Cir. 1994) (holding that early right-to-sue letters do not preclude suits in the district courts) and Brown v. Puget Sound Elec. Apprenticeship & Training Trust, 732 F.2d 726, 729 (9th Cir. 1984) ("Puget Sound") (concluding the same), and Walker v. United Parcel Serv. Inc., 240 F.3d 1268, 1274 (10th Cir. 2001) (following Sims and Puget Sound).  The Second Circuit, though, has not expressly decided this question.  See Arroyo v. WestLB Admin., Inc., 213 F.3d 625, 2000 WL 562425, at *1 (2d Cir. 2000) (Table) (declining to decide the issue while noting that the circuits are split and that the Second Circuit has not resolved the question).  The district courts within the Second Circuit have disagreed about the consequences of early right-to-sue letters.  Compare McGrath v. Nassau Health Care Corp., 217 F. Supp. 2d 319, 325-27 (E.D.N.Y.

2002) (holding that issuance of premature right-to-sue letter did not warrant dismissal of Title VII claim), with Stafford v. Sealright, Inc., 100 F. Supp. 2d 137, 139-40 (N.D.N.Y. 2000) (holding that failure of EEOC to wait 180 days before issuing right-to-sue letter precluded the plaintiff's lawsuit).  The courts dismissing cases brought under early right-to-sue letters have found that "Congress contemplated that investigation and conciliation efforts on the part of the EEOC . . . [are] an integral part of the Title VII remedy, and that the EEOC is, therefore, required to make some effort at investigating a charge and conducting some conciliation between employer and employee during the 180-day period." Commodari v. Long Island Univ., 89 F. Supp. 2d 353, 382 (E.D.N.Y. 2000).  Those courts that allow suits brought under early right-to-sue letters reason that "Congress included the 180-day period as a statutory 'outer limit' after which the EEOC must cede its exclusive jurisdiction; . . . [Congress] did not intend to bar the EEOC from waiving its exclusive jurisdiction before expiration of the 180 days, if it believes that doing so will benefit claimants and facilitate the purposes of Title VII." McGrath, 217 F. Supp. 2d at 326 (internal quotations omitted).

The rationale advanced by courts allowing suits based on early right-to-sue letters to proceed is more persuasive.  "[T]he EEOC is overburdened with pending cases and lacks the resources

to investigate all of those cases within the 180 day period."
Id. at 327.  Thus, "[i]nvalidating [the early right-to-sue
letter] process will only encourage the EEOC to hold charges in
limbo for the 180-day period."  Id.  Moreover, to dismiss
Cendali's claim because the EEOC issued its right-to-sue letter
early would be grossly unfair to Cendali.  Dismissing Cendali's
Title VII claim for this reason "will result in wasted resources
and penalizes [the plaintiff] for the EEOC's procedures."  Id.
Consequently, the court finds that Cendali's Title VII claims
should not be dismissed because the EEOC issued the right-to-sue
letter early.

Cendali's Title VII claim that the City retaliated against
him because he filed an affidavit in support of Cockfield fails,
however, because the evidence he has presented is insufficient,
as a matter of law, to support his claim.  "Retaliation claims
under Title VII are tested under a three-step burden shifting
analysis."  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768
(2d Cir. 1998); see McDonnell Douglas Corp. v. Green, 411 U.S.
792, 802-04 (1973).  "First, the plaintiff must make out a prima
facie case of retaliation."  Quinn, 159 F.3d at 768.  "To
establish a prima facie case of retaliation, an employee must
show [1] participation in a protected activity known to the
defendant; [2] an employment action disadvantaging the plaintiff;
and [3] a causal connection between the protected activity and

the adverse employment action." Id. at 769 (internal quotations
omitted).  The burden of establishing a prima facie case is
"minimal."  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506
(1993).  If the plaintiff makes his prima facie case, "the
defendant then has the burden of articulating a legitimate, non-
retaliatory reason for the complained of action."  Quinn, 159
F.3d at 768.  If the defendant can articulate such a legitimate,
non-retaliatory reason, the plaintiff "must adduce evidence
sufficient to raise a fact issue as to whether [the employer]'s
reason was merely a pretext for retaliation."  Id. at 769
(internal quotations omitted).  That is, the plaintiff must show
that retaliation "was the real reason for the employment action."
Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

     There is no dispute as to whether Cendali has satisfied the
first element of his prima facie case.  Filing his affidavit in
support of Cockfield's complaint is a protected activity about
which the City would have known.  For the next element of his
prima facie case Cendali must demonstrate that he experienced an
"adverse employment action."  "An 'adverse employment action' is
one which is 'more disruptive than a mere inconvenience or an
alteration of job responsibilities.'" Terry v. Ashcroft, 336 F.3d
128, 138 (2d Cir. 2003) (quoting Galabya v. New York City Bd. of
Educ., 202 F.3d 636, 640 (2d Cir. 2000)).  Examples of adverse
employment actions "include 'termination of employment, a

demotion evidenced by a decrease in wage or salary, a less
distinguished title, a material loss of benefits, significantly
diminished material responsibilities, or other indices . . .
unique to a particular situation." Id. (quoting Crady v. Liberty
Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir.
1993)).

Cendali has failed to provide evidence that he was the
victim of an adverse employment action.  Cendali asserts that, in
retaliation for his support of Cockfield, the City retaliated by
giving Cendali "unfair and baseless disciplinary actions, failure
to promote, filing of false police reports, failure to provided
[sic] adequate information and/or training to perform the job and
differential treatment."  Yet, Cendali backs his allegations here
with scant evidence.  In Cendali's opposition papers, Cendali
makes much of the fact that the City reclassified its DWS plants.
Cendali states that this action, which upgraded the
classification of certain plants, effectively demoted Cockfield,
who had once been a chief plant operator, but, after the change
in the plants' status, no longer had the adequate operator's
license to hold that position.  In Cendali's opinion, the City
reclassified the plant with the intent to discriminate against
Cockfield, a minority worker.  Whether or not Cendali's claims in
this regard are true, they are irrelevant.  A jury has already
rendered a verdict in favor of the City as to Cockfield's claims,

so it is not proper for the court to now re-consider the merits of Cockfield's case.  Instead, the court must look at the alleged incidents of retaliation that occurred because Cendali filed an affidavit in support of Cockfield.

The court notes that Cendali, in his papers and affidavits, mentions certain disciplinary actions that were the subject of the 2001 action, namely, an eight-day suspension on February 3, 1999, a ten-day suspension on November 30, 1999, a twenty-day suspension on March 27, 2000, and Cendali's termination on May 31, 2000.  Leaving aside the fact that these incidents occurred after the filing of the 1998 action, it is worth noting that the court, in the 2001 action, has already addressed these issues in the July 31, 2003 Ruling on Defendants' Motion for Summary Judgment.  More specifically, the court found that the three suspensions and other twenty-six incidents involved in the 2001 action "do not constitute adverse employment actions" (Ruling on Def. Mot. Summ. J. at 9), and Cendali's ultimate termination was found to be lawful in that case.  Cendali presents nothing that would change the court's findings with regard to those incidents. Consequently, those occurrences cannot support Cendali's Title VII claim here.

The remainder of Cendali's evidence with regard to adverse employment actions is wholly inadequate to support a Title VII claim.  Cendali maintains that he received a number of

-19-

unjustified and factually inaccurate negative criticisms of his
work, but he gives no specifics with regard to these criticisms.
Even if Cendali had given more detail about how he was
criticized, the court finds that such criticisms of his work
performance would not be adverse employment actions, considering
that a criticism does not rise to the level of a "termination of
employment," "demotion evidenced by a decrease in wage or
salary," "less distinguished title," "material loss of benefits,"
or "significant diminishing of material responsibilities."
Cendali claims that he was disciplined for using the telephone to
consult on his wife's health, but again, this incident (about
which Cendali gives no specifics) does not rise to the level of
an adverse employment action.  The fact that Cendali had to work
outdoors in "extremely inclement weather" also does not meet the
standard of an adverse employment action.  In addition, the
denial of overtime work, which Cendali claims was "consistent,"
even though he points to only one incident in December of 1997,[4]
is not sufficient to constitute an adverse employment action.
Cendali has presented no evidence of adverse employment actions
that would satisfy his burden to establish a <u>prima facie</u> case of

---

[4] In his deposition, Cendali testified that his grievance
with regard to the overtime snow clearance work was concluded
because a settlement had been reached, and that he was not that
concerned about losing the one hour of work.  (<u>See</u> Dkt. # 164,
Ex. C at 220:6-22 & 242:10-12).

discrimination, and, as a result, the City's motion as to Count Two is granted.

D.   COUNT THREE: FIRST AMENDMENT RETALIATION

Cendali next asserts a First Amendment retaliation claim, pursuant to 42 U.S.C. § 1983, against the city.  As the Second Circuit has held,

> a plaintiff making a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination.

Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999); see Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-87 (1977).  "The question of whether certain speech enjoys a protected under the First Amendment is one of law, not fact." Morris, 196 F.3d at 110.  "Central to this inquiry is whether the speech may 'be fairly characterized as constituting speech on a matter of public concern.'" Id. (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).  In general, "speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment." Id. (quoting Connick, 461 U.S. at 146).  Cendali's act of filing an affidavit for Cockfield's discrimination claim satisfies this first element, and the City does not dispute that Cendali was speaking on a

matter of public concern.[5]

Cendali has not satisfied the second element, however. "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Id. Although it is true that "lesser actions may also be considered adverse employment actions" with regard to a First Amendment retaliation claim, id., the actions that the court must now consider do not rise to the level of adverse employment actions. As stated herein, the court, during the course of the 2001 action, has already made findings with regard to Cendali's major suspensions and termination. The court notes that Cendali has made some broad, general accusations, and the court will not give weight to any of Cendali's accusations that are based upon conjecture or speculation. Cendali thus leaves the court with few specifics upon which to make findings, and those specific

---

[5] The City argues that the court should dismiss Cendali's First Amendment claims because the liability of a municipality under § 1983 cannot be predicated upon the theory of respondeat superior. See Monell, 436 U.S. at 694 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); Ciraolo v. City of New York, 216 F.3d 236, 242 (2d Cir. 2000). Rather, "[i]n order to impose § 1983 liability upon a municipality, a plaintiff must demonstrate that any constitutional harm suffered was the result of a municipal policy or custom." Curry v. City of Syracuse, 316 F.3d 324, 330 (2d Cir. 2003) (quoting Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992)). Because the outcome of Cendali's First Amendment claim would be the same both under the City's analysis and under a discussion of the merits, for the purposes of this decision, the court will reach the merits of Cendali's claim.

incidents that the court can discern from Cendali's papers (see supra, Part C, Title VII discussion) are insufficient, as a matter of law, to constitute adverse employment actions.  The City's motion as to Count Three is granted.

E. COUNT FOUR: EQUAL PROTECTION

In Count Four, Cendali claims that the City "has established and maintained policies, practices, procedures and/or customs of establishing, implementing, applying, enforcing and reviewing personnel and employment policies, decisions and procedures, and recommending, determining, and executing remedial and/or corrective actions and issue [sic] directives based upon or influenced by the [sic] race, color, sex, age and for providing support to employees in pursuit of their legal rights."  (Second Am. Compl., ¶ 131).  According to Cendali, the City, pursuant to these discriminatory policies, has discriminated and retaliated against him in the terms and conditions of his employment in violation of his Equal Protection rights under the Fourteenth Amendment.

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Supreme Court has held that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne,

-23-

<u>Tex. v. Cleburne Living Ctr. Inc.</u>, 473 U.S. 432, 439 (1985).  A
plaintiff claiming a violation of his equal protection rights
can proceed according to several theories:

> A plaintiff could point to a law or policy that
> "expressly classifies persons on the basis of race."
> [<u>Hayden v. County of Nassau</u>, 180 F.3d 42, 48 (2d Cir.
> 1999] (citing <u>Adarand Constructors, Inc. v. Pena</u>, 515
> U.S. 200, 213, 227-29 . . . (1995)).  Or, a plaintiff
> could identify a facially neutral law or policy that
> has been applied in an intentionally discriminatory
> manner.  <u>See</u> <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 373-74
> . . . (1886).  A plaintiff could also allege that a
> facially neutral statute or policy has an adverse
> effect and that it was motivated by discriminatory
> animus.

<u>Brown v. City of Oneonta, N.Y.</u>, 221 F.3d 329, 337 (2d Cir.
2000).

Cendali does not clearly set forth facts from which the
court could discern how he was treated differently from
similarly situated employees.  In his opposition papers, Cendali
gives two examples of what he perceives to be unequal treatment.
Cendali claims that there was an incident during which Fisco had
grabbed Cendali with such force that Cendali had to grab Fisco's
scrotum in order to get Fisco to release his grip.  According to
Cendali, the City did not discipline Fisco for this act.
Cendali compares this incident to the events that led up to his
eight-day suspension (which was mentioned above), where he "had
a verbal exchange with Phil Lombardo, for which he apologized
immediately following [sic], he was suspended without pay

immediately [sic]." (Dkt. # 166 at 13) ("Pl.'s Mem.").[6]  Cendali

also points to another "contrast in the administration of

discipline," where Fisco apparently brought a firearm to work,

yet was never punished, whereas "Cendali received a week [sic]

suspension without pay for complying with the direction of the

Police Department."[7]  (Pl.'s Mem. at 12-13).  It seems that

Cendali, at least with regard to these incidents, is claiming

---

[6] The court notes that this "verbal exchange" was a subject
of the 2001 action and the reason for the eight-day suspension.
"On February 2, 1999, Philip Lombardo . . . provided a written
statement to the City . . . wherein he reported that following a
meeting with [Cendali], [Cendali] stated: 'It is not over with
you and I'm going to kill you.' . . . [Cendali] testified at his
deposition that he exchanged words with Lombardo while inside
City Hall during a normal business day, and admitted that he used
the word 'kill' when speaking to Lombardo." (Ruling on Def. Mot.
Summ. J. at 3).

[7] Again, the court notes that this disciplinary action was
the ten-day suspension, which was a subject of the 2001 action.
As to Cendali's contention that he was suspended for complying
with a police directive, the court recounts its earlier findings:

The background of this suspension is as follows: Fisco
claims that he asked [Cendali] to relinquish a key to
the Middletown Police Department's Police Pistol
Course, but [Cendali] refused. [Cendali] denies Fisco's
account of this incident, but does not recall the
reason for the dispute or whether Fisco requested him
to provide the key. . . . Nevertheless, it is
undisputed that [Cendali] eventually turned the key
over to the Middletown Police Department. . . . Fisco
provided a memo to Russo requesting a disciplinary
review of the incident. . . . Following [a fact-
finding] investigation, [Deputy Director of DWS
Michael] Guarini determined that [Cendali] was
insubordinate and recommended a five to ten-day
suspension without pay.

(Ruling on Def. Mot. Summ. J. at 4).

that the City selectively enforced its disciplinary code against him, presumably because of his support for his minority co-workers.

Although selective enforcement is a "murky corner of equal protection law," LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir. 1980), the Second Circuit has ruled that such a claim is appropriate under the following circumstances:

> (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995) (quoting FSK Drug Corp. v. Perales, 960 F.2d 6, 10 (2d Cir. 1992)).  Cendali cannot prevail solely by showing that he was treated differently than others, because "'equal protection does not require that all evils of the same genus be eradicated or none at all.'" Id. at 684 (quoting LeClair, 627 F.2d at 608). Cendali's evidence here is not sufficient to sustain an equal protection claim.  Even if the court were to assume that Cendali has demonstrated that the City had a policy or custom of treating him differently than other workers (which Cendali has not adequately demonstrated) Cendali has not compared himself with a similarly situated employee.  Cendali compares his treatment with Fisco's treatment, but Cendali and Fisco did not

-26-

have the same job responsibilities, and Fisco's purported infractions were not the same as Cendali's infractions.  That is, Fisco and Cendali were not equals at work; indeed, Fisco was Cendali's supervisor, and Cendali does not demonstrate that his violations were similar to Fisco's alleged violations. Therefore, Cendali cannot maintain his equal protection claim with regard to these incidents.

Cendali's remaining evidence is inadequate to sustain his claim.  In his opposition papers, Cendali states the following:

> [f]rom Jaunary 1, 1994 until February 11, 1998, there were forty three [sic] (43) grievances filed protesting management action in the DWS twenty (20) of the grievances involved current or pass [sic] Plaintiff [sic] to this action.  Of the remain [sic] twenty three [sic], five involve MaryLee Dorflinger which [sic] address harassment and favoritism, three (3) involve an African American [sic], Willie Pickard who was terminated.  Unfair treatment and favoritism represent sixty-five (65%) percent [sic] of the grievances file [sic] within the DWS.  Of the remain [sic] grievances, only 4 other persons filed grievances excluding Mary Lee [sic] Dorfinger [sic].  During the period from February 16, 1994 until February 11, 1998, only two grievances, which addressed overtime pay, were upheld.

(Pl.'s Mem. at 13).  Apparently, Cendali is trying to make a summary of union grievances filed by Local 466 between January 1, 1994 through February 11, 1998.  From the statement quoted above, Cendali says that only two grievances were upheld between February 16, 1994 and February 11, 1998.  Yet, based on the exhibits that Cendali filed with his own opposition papers, Cendali's assertion is wrong because the paperwork Cendali

submitted seem to indicate that more than two grievances were upheld.  This list of grievances fails to demonstrate how the City violated Cendali's equal protection rights.  A comparison between the overall amount of grievances filed and the overall amount of grievances upheld has little meaning to Cendali's claim.  Additionally, the equal protection claims from the other plaintiffs in this case have been tried to a jury, and the court will not re-litigate those issues here.  Cendali does not offer any evidence with regard to his grievances or how they relate to his equal protection claims.  Based on this submission, the court sees no evidence of Cendali being treated differently from other similarly situated employees.  Therefore, Cendali cannot maintain an equal protection claim with regard to his grievance summary.

Cendali offers nothing else that would support his equal protection claim.  Leaving aside the general assertions that he received a number of "unjustified and factually inaccurate negative criticisms," the remainder of Cendali's specific complaints are not sufficient to sustain his equal protection claim.  Cendali has not shown how, for example, working outdoors in "extremely inclement weather" or being disciplined for using the telephone to consult his wife's health is an equal protection violation.  He has not shown how, with any of these incidents, how the City treated him unequally and unfairly.

Consequently, Cendali cannot sustain his equal protection claim, and the City's motion with regard to Count Four is granted.

F. COUNT FIVE: SUBSTANTIVE DUE PROCESS

Cendali next claims that City officials "have subjected [him] to harassing and retaliatory treatment in the terms and conditions of [his] employment so as to offend common notions of fundamental fairness by exhibiting a deliberate indifference to [his] complaints of discrimination in violation of the Due Process Clause of the 14th Amendment of the United States Constitution."  (Second Am. Compl., ¶ 137).  Cendali asserts that the City's officials retaliated against him because of his discrimination complaints by exhibiting deliberate indifference to his complaints in violation of his right to substantive due process.

"Substantive due process is an outer limit on the legitimacy of governmental action."  Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999).  The Supreme Court has emphasized "that the touchstone of due process is protection of the individual against arbitrary action of government . . . whether the fault lies in a denial of fundamental procedural fairness, . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998) (internal quotations and citations

-29-

omitted).

Cendali claims that, with regard to his discrimination claims, he "attempted to seek the intervention of [Holzberg] and Lawrence Kinch, Director of Personnel . . . to no avail. [Cendali's] efforts have included direct written appeals to Holzberg, public appeals to the Common Council for the City of Middletown, appeals through the press, and appeals to the Justice Department of the United States.  Throughout these appeals for relief there have never been a single boni [sic] fide investigation undertaken." (Pl.'s Mem. at 3-4).

"For a substantive due process claim to survive . . ., it must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005)(quoting Sacramento, 523 U.S. at 847 n.8).  Although the courts "tend to speak of that which 'shocks the conscience' largely in the context of excessive force claims . . . . it can apply to other areas of government activity as well."  Id. at 93-94 (internal citations omitted).  "'[M]alicious and sadistic' abuses of power by government officials, intended to 'oppress or to cause injury' and designed for no legitimate government purpose, 'unquestionably shock the conscience.'" Id. at 94 (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir. 2001)).  The court uses the "shock the conscience"

test because "our constitutional notion of due process rests on the bedrock principle that we must protect the individual 'against . . . the exercise of power without any reasonable justification in the service of a legitimate governmental objective." Id. (quoting Sacramento, 523 U.S. at 845-46).

The alleged "deliberate indifference" of Holzberg and Kinch in this matter does not rise to the level of action that is "malicious" or "sadistic."  That is to say, Cendali's allegations with regard to inaction by Holzberg and Kinch do not "unquestionably shock the conscience."  Indeed, in response to Cendali's letter to Holzberg, Holzberg wrote back, informing Cendali that she had spoken with Russo regarding Cendali's complaints, and that because Cendali was represented by a bargaining unit, she recommended that he follow the procedures in the CBA.  The court does not see how this is "deliberate indifference," nor does it see how this "shocks the conscience." In fact, from what the court can discern from the CBA, which Cendali attached to his Amended Complaint, a direct appeal to the mayor was not a step in the grievance process.[8]  Also,

---

[8] Article XVI, Section 3, of the CBA dictates how members of the Local 466 were to handle disputes and grievances:

Step 1 - The aggrieved employee, with or without his/her union representative shall state in writing his/her case to the head of his/her department or designee within twenty (20) working days of his/her knowledge of the incident. . . .

-31-

Cendali attached to his opposition papers a list of the grievances filed by Local 466 DWS employees between 1994 and 1998, and that list does not indicate that all grievances filed by the plaintiffs, including Cendali, were ignored, or even denied.  There are a number of examples on that list where the grievance was withdrawn or resolved; in some circumstances, the grievance was pursued to Step 3 of the grievance procedure. Thus, Cendali cannot even support his claim that his substantive due process rights were violated because of "deliberate indifference."

In addition, Cendali, in his attempt to support his allegation, advances no distinct facts in Count Five that would give rise to a separate substantive due process claim.  The

---

Step 2 - In the event the grievance is not resolved in Step 1 the employee and his Union representative may within ten (10) working days of receipt of written notice submit the grievance . . . in writing to the Personnel Director.  Within ten (10) working days from date of receipt . . ., the Personnel Director shall convene a meeting for the purpose of reviewing the facts germane to the grievance. . . . The Personnel Director shall render a written decision within ten (10) working days subsequent to the date of the meeting.

Step 3 - If the grievance is not resolved at Step 2 either party may submit it to the State Board of Mediation and Arbitration, or . . . the matter may be submitted to the American Arbitration Association at the City's discretion.

(Dkt. # 18, Ex. A at 19-20).

Second Circuit has held that "where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."  Id. at 94.  In any event, because the City's actions, as a matter of law, are not sufficiently egregious to constitute a violation of Cendali's substantive due process rights, Cendali's substantive due process claim must fail.  The City's motion with regard to Count Five is granted.

### G. COUNT SIX: PROCEDURAL DUE PROCESS

In Count Six, Cendali claims that the City violated his procedural due process rights under the Fourteenth Amendment "by refusing, on an arbitrary, capacious [sic] and discretionary bases [sic], to investigate [Cendali's] claims of discrimination and summarily dismissing any opportunity for [Cendali] to meet with and discuss [his] complaints with Holzberg, acting in her capacity as Mayor as the designated official who was in the position to investigate or authorized [sic] the investigation of such complaints, influence municipality policies, and/or offer appropriate remedies for discriminatory or harassing treatment." (Second Am. Compl., ¶ 140).  That is, Cendali claims that his procedural due process rights were violated because Holzberg refused to meet with him to discuss his discrimination complaints.

"The requirements of procedural due process apply only to
the deprivation of interests encompassed by the Fourteenth
Amendment's protection of liberty and property.  When protected
interests are implicated, the right to some kind of prior
hearing is paramount."  Bd. of Regents of State Colleges v.
Roth, 408 U.S. 564, 569-70 (1972); see also Patterson v. City of
Utica, 370 F.3d 322, 329 (2d Cir. 2004) ("The Due Process Clause
of the Fourteenth Amendment requires that, generally, a person
must be afforded the opportunity for a hearing prior to being
deprived of a constitutionally protected liberty or property
interest."); New York State Nat'l Org. for Women v. Pataki , 261
F.3d 156, 164 (2d Cir. 2001) ("NOW") ("procedural due process
protects only important and substantial expectations in life,
liberty, and property").  As the Supreme Court has maintained,
although "'[l]iberty' and 'property' are broad and majestic
terms,"  Roth, 408 U.S. at 571, "the range of interest protected
by procedural due process is not infinite," id. at 570.

Cendali has not set forth an interest of which the City has
deprived him.  The term "liberty"

> denotes not merely freedom from bodily restraint but
> also the right of the individual to contract, to engage
> in any of the common occupations of life, to acquire
> useful knowledge, to marry, establish a home and bring
> up children, to worship God according to the dictates
> of his own conscience, and generally to enjoy those
> privileges long recognized . . . as essential to the
> orderly pursuit of happiness by free men.

Id. at 572 (quoting Meyer v. Nebraska, 262 U.S. 390, 399

-34-

(1923)).  There is little doubt that "[i]n a Constitution for a free people, . . . the meaning of 'liberty' must be broad indeed."  Id.  Nevertheless, the court does not believe that Cendali asserts anything here that is a deprivation of a liberty interest because Cendali's claim does not even resemble a loss of a long-recognized privilege "essential to the orderly pursuit of happiness."

Thus, Cendali must be claiming that he was deprived of a property interest in violation of his procedural due process rights.  "The Fourteenth Amendment due process guarantee . . . only extends to property claims to which an individual has a 'legitimate claim of entitlement.'"  NOW, 261 F.3d at 164 (quoting Roth, 408 U.S. at 577).  That is, Cendali must demonstrate that he possessed "a property interest of constitutional dimension."  Furlong v. Shalala, 156 F.3d 384, 393 (2d Cir. 1998).  "A cognizable property interest is more than just a 'unilateral expectation,'"  id., for procedural due process does not protect "trivial and insubstantial interest[s]," Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 783 (2d Cir. 1991).  Indeed, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it."  Roth, 408 U.S. at 577.

Cendali has failed to show that his procedural due process rights were violated.  There is nothing to indicate that Cendali

had a constitutionally-protected property interest in Holzberg personally conducting an investigation into his claims, or in Holzberg meeting with him.  Aside from the fact that Cendali has not proven that Holzberg did not investigate his discrimination claims, Cendali did not have "legitimate claim of entitlement" to an investigation by, or a meeting with, Holzberg.   "Property interests . . . are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  Id.  Cendali gives no such "independent source" that would bestow upon him a property interest in an investigation by the City's mayor, or in a meeting with the City's mayor.  Cendali's need or desire for Holzberg to investigate his claims and meet with him, however, do not implicate due process.  Consequently, the City's motion with regard to Count Six is granted.

### H. COUNTS SEVEN AND EIGHT: CONSPIRACY

#### 1. Section 1985 Conspiracy

In Count Seven, Cendali claims that the City "discriminated against [him] by conspiring to prevent and preventing minorities inclusive of Plaintiffs from obtaining training opportunities, and conspiring to prevent employees from obtaining redress for harassment based on their race, color and engagement in protected speech in violation of 42 U.S.C. § 1985."  (Second Am.

Compl., ¶ 143).  Section 1985(3) provides:

> If two or more persons in any State . . . conspire
> . . . , for the purpose of depriving, either directly
> or indirectly, any person or class of persons of the
> equal protection of the laws, or of equal privileges
> and immunities under the laws; . . . whereby another is
> injured in his person or property, or deprived of
> having and exercising any right or privilege of a
> citizen of the United States, the party so injured or
> deprived may have an action for the recovery of damages
> occasioned by such injury or deprivation, against any
> one or more of the conspirators.

42 U.S.C. 1985(3).  Cendali claims that the City, by illegally

conspiring against him, deprived him of his civil rights.

> As the Second Circuit has held,

> [t]he four elements of a § 1985(3) claim are: (1) a
> conspiracy; (2) for the purpose of depriving, either
> directly or indirectly, any person or class of persons
> of equal protection of the laws, or of equal privileges
> and immunities under the laws; (3) an act in
> furtherance of the conspiracy; (4) whereby a person is
> either injured in his person or property or deprived of
> any right of a citizen of the United States.

Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085,

1087 (2d. Cir. 1993).  Any such conspiracy "must also be

motivated by 'some racial or perhaps otherwise class-based,

invidious discriminatory animus behind the conspirators'

action.'" Id. at 1088 (quoting United Bhd. of Carpenters, Local

610 v. Scott, 463 U.S. 825, 829 (1983)).  "In order to maintain

an action under Section 1985, a plaintiff 'must provide some

factual basis supporting a meeting of the minds, such that

defendants entered into an agreement, express or tacit, to

achieve the unlawful end." Webb v. Goord, 340 F.3d 105, 110 (2d

Cir. 2003) (quoting <u>Romer v. Morgenthau</u>, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)).

Cendali's conspiracy claim fails as a matter of law. Cendali offers no evidence to show any "meeting of the minds;" indeed, Cendali does not address his conspiracy claims in his opposition papers.  Cendali supports his claim only with conclusory and general allegations of conspiracy.  Because Cendali only offers some vague notion of conspiracy, without any facts, his conspiracy allegation must fail.  <u>See</u> <u>Webb</u>, 340 F.3d at 111 ("The plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all the defendants.  Their conspiracy allegation must therefore fail."); <u>Boddie v. Schnieder</u>, 105 F.3d 857, 862 (2d Cir. 1997) (holding that it is proper to dismiss "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights.").  The City's motion with regard to Count Seven is granted.

　　　2. Section 1986 Neglect to Prevent Conspiracy

In Count Eight, Cendali claims that the City, "having knowledge of the discrimination and retaliation against Plaintiffs and other employees and having the power to prevent such discriminatory and retaliatory treatment, [has] refused or neglected to take any action to prevent such discriminatory and retaliatory actions in violation of 42 U.S.C. § 1986."  (Second

Am. Compl., ¶ 146).   Section 1986 provides:

> Every person who, having knowledge that any of the
> wrongs conspired to be done, and mentioned in section
> 1985 of this title, are about to be committed, and
> having power to prevent or aid in preventing the
> commission of the same, neglects or refuses so to do,
> if such wrongful act be committed, shall be liable to
> the party injured . . .  for all damages caused by such
> wrongful act, which such person by reasonable diligence
> could have prevented.

42 U.S.C. § 1986.  As seen from the text of the statute, § 1986

provides a cause of action against anyone who had knowledge of

the wrongs conspired to be done and mentioned in § 1985, and had

the power to prevent the commission of the conspiracy, but

neglected to act.  As a result, "a § 1986 must be predicated

upon a valid § 1985 claim."  <u>Mian</u>, 7 F.3d at 1088; <u>see also</u>

<u>Brown</u>, 221 F.3d at 341.  Because Cendali does not have a valid §

1985 claim, his § 1986 claim must fail.  The City's motion with

regard to Count Eight is granted.

I. COUNTS NINE AND TEN: BREACH OF CBA

1. LMRA Violation[9]

In Count Ten, Cendali claims that the City has

"discriminated and retaliated against Plaintiffs in breach of

their duty of fair dealings pursuant to the Collective

Bargaining Agreement . . . . [The City's] actions constitute a

violation of 29 U.S.C. § 185(a)."  (Second Am. Compl., ¶ 151).

---

[9] The court, in order to resolve any preemption issues that
may arise with regard to Cendali's CBA claims, will address Count
Ten, Cendali's LMRA claim, before Count Nine.

Section 301 of the LMRA provides the following:

> Suits for violation of contracts between an employer
> and a labor organization representing employees in an
> industry affecting commerce as defined in this chapter,
> or between any such labor organizations, may be brought
> in any district court of the United States having
> jurisdiction of the parties, without respect to the
> amount in controversy or without regard to the
> citizenship of the parties.

29 U.S.C. § 185(a).

Cendali's claim here cannot stand. The LMRA specifically
excludes States or political subdivisions thereof from its
definition of "employer." See 29 U.S.C. § 142(3) (incorporating
the National Labor Relations Act ("NLRA") definition of
"employer" from 29 U.S.C. § 152(3)[10]); see also Strasburger v.
Bd. of Educ., Hardin County Cmty. Unit Sch. Dist. No. 1, 143 F3d
351, 359 (7th Cir. 1998).  The Supreme Court has "limited the
exemption for political subdivisions to entities that are either
(1) created directly by the state, so as to constitute
departments or administrative arms of the government, or (2)
administered by individuals who are responsible to public
officials or to the general electorate."  Rose v. Long Island
R.R. Pension Plan, 828 F.2d 910, 916 (2d Cir. 1987) (finding
that the Metropolitan Transit Authority was a political
subdivision of the State of New York) (quoting N.L.R.B. v.

---

[10] "The term 'employer' . . . shall not include . . . any
State or political subdivision thereof. . . ." 29 U.S.C. §
152(2).

-40-

Natural Gas Util. Dist. of Hawkins County, 402 U.S. 600, 604-05

(1971) (finding that Respondent Utility District was a political

subdivision subject to the exemption to jurisdiction under the

National Labor Relations Act)).

As a result, the City, under the criteria set forth by the

Supreme Court, is a "political subdivision" under the NLRA and

LMRA because, as a municipality, it is "administered by

individuals who are responsible to public officials or to the

general electorate."  Therefore, the City cannot be an

"employer" under the LMRA, and it follows that Cendali is not an

"employee," § 152(3),[11] because he does not work for an

"employer."  Consequently, Cendali's LMRA claim fails, and the

City's motion with regard to Count Ten is granted.

        2. Lack of Fair Dealing and Good Faith[12]

In Count Nine, Cendali maintains that "[a]s a result of

---

    [11] "The term 'employee' . . . shall not include . . . any
individual employed . . . by any other person who is not an
employer as herein defined." 29 U.S.C. § 152(3).

    [12] The court notes that the LMRA, if it had applied to this
case, would preempt Cendali's claims regarding the alleged breach
of the covenant of good faith and fair dealing.  See Williams v.
Comcast Cablevision of New Haven, Inc., 322 F. Supp. 2d 177, 185-
86 (D. Conn. 2004); Carvalho v. Int'l Bridge & Iron Co., No.
3:99CV605(CFD), 2000 WL 306456, at *7-8 (D. Conn. 2000); see also
Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 219 (1985) ("Since
nearly any alleged willful breach of contract can be restated as
a tort claim for breach of a good-faith obligation under
contract, the arbitrator's role in every case could be bypassed
easily if § 301 is not understood to pre-empt such claims.")

[the City's] lack of fair dealing and good faith with
Plaintiffs, in breach of the collective bargaining agreement,
Plaintiffs, individually and collectively, have suffered
financial and emotional loss."  (Second Am. Compl., ¶ 149).

"When courts interpret CBAs, traditional rules of contract
interpretation apply as long at they are consistent with federal
labor policies." Aeronautical Indus. Dist. Lodge 91 of the
Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v.
United Techs. Corp., 230 F.3d 569, 576 (2d Cir. 2000).  In
contract law, "the implied warranty of good faith [and fair
dealing] is read into all contracts." Fabri v. United Techs.
Int'l, Inc., 387 F.3d 109, 127 (2d Cir. 2004) (citing Celentano
v. Oaks Condo. Ass'n, 265 Conn. 579, 617 (2003)("It is axiomatic
that the implied duty of good faith and fair dealing is a
covenant implied into a contract or a contractual relationship.
. . .  The covenant of good faith and fair dealing presupposes
that the terms and purpose of the contract are agreed upon by
the parties and that what is in dispute is a party's
discretionary application or interpretation of a contract
term.") (internal quotations omitted)).

"Employers must bargain in good faith with unions that
represent a majority of employees in an appropriate unit. . . .
Good faith requires that an employer explain its positions on
various issues." Stroehmann Bakeries, Inc. v. Nat'l Labor

Relations Bd., 95 F.3d 218, 222 (2d Cir. 1996).  Also, the
"covenant of good faith and fair dealing requir[es] that neither
party do anything that will injure the right of the other to
receive the benefits of the agreement." Elm Haven Constr. Ltd.
P'ship v. Neri Constr. LLC, 376 F3d 96, 102 (2d Cir. 2004)
(quoting Habetz v. Condon, 224 Conn. 231, 238 (1992)).  "'Bad
faith means more than mere negligence; it involves a dishonest
purpose.'" Id. (quoting Habetz, 224 Conn. at 237).

Cendali offers nothing to demonstrate how the City breached
the covenant of good faith and fair dealing.[13]  Cendali does not
show how the City acted with a "dishonest purpose" or how the
City injured his rights to receive the benefit of the CBA.
Therefore, the City's motion with regard to Count Nine is
granted.

J. COUNTS ELEVEN AND TWELVE: EMOTIONAL DISTRESS

1. Intentional Infliction of Emotional Distress

In Count Twelve[14], Cendali asserts that "[t]hrough . . .
extreme and outrageous behavior, [the City] intentionally
inflicted severe emotional distress upon [Cendali] or knew or

---

[13] Indeed, Cendali does not address his CBA claims in his
opposition papers.

[14] Because the claim in Count Twelve is intentional
infliction of emotional distress, which has a more stringent
standard than the negligent infliction of emotional distress
claim in Count Eleven, the court believes it is logical to
discuss Count Twelve first.

should have known that severe emotional distress was a likely result of said conduct."  (Second Am. Compl., ¶ 157)

With respect to intentional infliction of emotional distress claims, the Connecticut Supreme Court has stated that, in order to recover damages on this theory,

> [i]t must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

Peytan v. Ellis, 200 Conn. 243, 253 (1986), superseded by statute on other grounds as recognized in Chadha v. Charlotte Hungerford Hosp., 272 Conn. 776 (2005).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine."  Appleton v.  Bd. of Educ. of Town of Stonington, 254 Conn. 205, 210 (2000).  "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  Id. at 210-11 (citing 1 Restatement (Second) of Torts § 46, comment (d) (1965)).

Cendali's allegations do not meet this standard.  Cendali's allegations could not, as a matter of law, give rise to a claim for intentional infliction of emotional distress.  The evidence

-44-

in the record demonstrates that Cendali had been disciplined by the City, but does not support the allegation that the City's employees, in disciplining him, acted in an extreme and outrageous manner that is atrocious and utterly intolerable to a civilized community.  Also, Cendali makes accusations of so-called "outrageous" behavior (for example, the filing of false police reports) without offering evidence to support these accusations.  Therefore, the City's motion must be granted with respect to Count Twelve.

> 2. Negligent Infliction of Emotional Distress

In Count Eleven, Cendali alleges the same facts as in his intentional infliction of emotional distress claim.  The dispositive issue when passing upon the validity of a negligent infliction of emotional distress claim in the employment context is whether the employer's conduct is so egregious that the employer "should have realized that its conduct involved an unreasonable risk of causing emotional distress, and that that distress, if caused, would result in illness or bodily harm." Perodeau v. City of Hartford, 259 Conn. 729, 751 (2002).  "An individual making an emotional distress claim must show that, as a result of the employer's conduct, a reasonable person would have suffered emotional distress that might result in illness or bodily harm." Id. at 755 (internal citation omitted).  Further, in the employment context, only conduct occurring during the

-45-

termination process may give rise to a valid infliction of emotional distress claim.  See id. at 762-63.  Although Cendali makes arguments with regard to his termination, Cendali's termination, as the court noted above, has already been addressed in the 2001 action.  Thus, Cendali's termination is not an issue here, and as such, he cannot, as a matter of law, prevail on this claim.  The City's motion with regard to Count Eleven is granted.

### K. COUNT THIRTEEN: AGE DISCRIMINATION

In his final Count, Cendali claims that the City discriminated and retaliated against him based on his age, in violation of the ADEA, 29 U.S.C. § 621 et seq.[15]

The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The ADEA's

---

[15] The court shall reach the merits of Cendali's ADEA claim, despite the City's arguments that the court lacks jurisdiction over Cendali's ADEA claim because it was not raised specifically in his EEOC charge.  The court has jurisdiction to hear those claims that are raised in the EEOC charge or are "reasonably related" to the charge.  See Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1403 (2d Cir. 1993), superseded by statute on other grounds as recognized in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998).  The City claims that Cendali, in his EEOC charge, made no factual allegation regarding age discrimination; Cendali, however, did check the "age" box on the charge, and the court finds that to be sufficient here.

prohibition against discrimination based on age protects employees who are at least forty years of age.  29 U.S.C. § 631(a).

The Second Circuit analyzes ADEA claims by using the burden-shifting framework of Title VII claims, which is set forth herein.  See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).  Cendali's age discrimination claim fails as a matter of law.  Although the burden of establishing a prima facie case is not heavy, Cendali has not even met that minimal standard.  Cendali, at the relevant times, was over forty years of age, and the court will assume that he was qualified for his position.  Cendali has not demonstrated that he suffered an "adverse employment action" in circumstances that give rise to an inference of age discrimination.  As the court pointed out in the discussion of Cendali's Title VII claim, Cendali has not demonstrated that, for the purposes of this case, he has suffered an adverse employment action.

Moreover, there is no indication that any criticism or negative treatment that Cendali received at work was due to age discrimination.  The specifics of Cendali's claim, i.e., that Cendali was injured on the job, and Fisco apparently noted on the accident report that Cendali was "getting old," and that Cendali had "over exerted himself," are not enough to give rise to an inference of age discrimination.  "Stray remarks, even if

-47-

made by a decisionmaker, do not constitute sufficient evidence
to make out a case of employment discrimination." Danzer v.
Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998).  These
comments, which the court will accept as true, are not
sufficient to support an age discrimination claim; indeed, the
comment that Cendali "over exerted himself" does not necessarily
have any connection to age at all.  Cendali's evidence here is
insufficient to support his age discrimination claim.  As a
result, the City's motion with regard to Count Thirteen is
granted.

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary
judgment (dkt. # 163) is **GRANTED** with respect to all of the
plaintiff's claims.  Judgment in favor of the City of Middletown
shall enter on Counts One through Thirteen of the Second Amended
Complaint with respect to Battista Dino Cendali.  The Clerk of
the Court shall close this file.

So ordered this 23rd day of August, 2005.


**/s/DJS**
_____
          **DOMINIC J. SQUATRITO**
     **UNITED STATES DISTRICT JUDGE**

-48-